UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:22-cv-00178-RJC-DSC

| | | |
|---|---|---|
| ANGELIA NIKOLE JAMES, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Order** |
| | ) | |
| CITY OF MONROE, ET AL., | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

**THIS MATTER** comes before the Court on Plaintiff's Second Motion for Preliminary Injunction (the "Motion"). (Doc. No. 15). For the reasons stated herein, the Motion is **DENIED**.

## I. BACKGROUND

### A. Factual Background

#### 1. Monroe City Council

In November 2019, Plaintiff was elected as a councilmember on the Monroe City Council. (Doc. No. 13 ¶ 40). She took office the next week for a four-year term. (*Id.*). The City Council consists of six councilmembers and the mayor. (*Id.* ¶ 39). The Council is responsible for the general governance of the City and appoints a city manager to serve as the City's chief administrative officer who oversees the day-to-day operations of the City, including personnel decisions. (*Id.* ¶ 39). The City Council makes employment decisions only as to the City Manager, the City Attorney, and the City Clerk; it does not hire, fire, demote, promote, or supervise any other City employee. (*Id.*).

#### 2. Events of September 9-10, 2021

In 2021, the Mayor of Monroe announced that he would not seek reelection. (*Id.* ¶ 41). Plaintiff decided to run for mayor, along with two other candidates. (*Id.*). In November 2021, Plaintiff ultimately lost her run for mayor. (*Id.* ¶ 71).

On September 9, 2021, Plaintiff was in the middle of her mayoral campaign. (*Id.* ¶ 42). According to Plaintiff, she woke up on September 9, 2021, saw a house under contract, and thought God was telling her that she was going to purchase the house. (*Id.* ¶ 43). She demanded to see the house even though it was already under contract because she "believed she was meant to have it." (*Id.* ¶¶ 43-44). Next, at 10:00 a.m., Plaintiff had an interview with a local newspaper during which she ate a smoothie. (*Id.* ¶ 45). That afternoon, Plaintiff spoke with Monroe Police Department Chief of Police J. Bryan Gilliard, and Plaintiff told Gilliard to retire. (*Id.* ¶ 46; Doc. No. 13-2 at 9). Later that evening, after demanding to see the house under contract, Plaintiff informed her husband that she was going to buy the house. (*Id.* ¶¶ 47-48). Plaintiff's husband was "puzzled" by her behavior. (*Id.* ¶¶ 48-50). To avoid an argument with her husband, Plaintiff left her home with her youngest son and went to a local hotel. (*Id.*).

When Plaintiff arrived at the hotel, the staff informed her that there was not a room available for her. (*Id.* ¶ 50). At that time, Plaintiff felt "God was speaking to her again, this time telling her that there were 'felons' at the [hotel]" and began accusing hotel guests of being felons. (*Id.* ¶¶ 50-52). Ultimately, the police responded to the hotel after Plaintiff called the Chief of Police and separately the hotel called the police because of Plaintiff's behavior. (*Id.*). When the police arrived, Plaintiff told them that there were felons in the hotel, and insisted that the police arrest the felons. (*Id.* ¶ 52). Plaintiff had various interactions with the police during this time, including, among other things:

- Directing the actions of the officers, including to arrest hotel guests;

- Calling a white female officer "uppity," that she needed to "change her character and her facial expressions," that she had poor body language, that Plaintiff was a Councilmember who deserved respect, and that going to Weddington High School "did not mean anything;"

- Purportedly promoting, demoting, and/or firing various responding officers;

- Attempting to remove a Captain's badge from his shirt; and

- Asserting that the Captain "don't like black people."

(*Id.* ¶ 53; Doc. No. 13-2 at 12-15). During these interactions with the police officers, Plaintiff asserted on multiple occasions that she was a councilmember. (Doc. No. 13-2 at 12-15). She also called the Chief of Police to inform him of her views on the officers and asserting to him that various officers with which she interacted were purportedly promoted, demoted, and/or fired. (*Id.*). Eventually, the Chief of Police contacted an off duty officer "very versed in handling situations like this" to respond to the hotel. (*Id.* at 14). The off duty officer informed Plaintiff's husband of the incident and they both responded to the hotel. (*Id.*). After Plaintiff's husband arrived, he informed officers that Plaintiff had a similar incident once before roughly ten years earlier. (Doc. No. 13 ¶ 54).

After some time, Plaintiff went home; however, at home she began arguing with her husband and within minutes Plaintiff contacted the police for assistance.[1] (Doc. No. 13 ¶¶ 54-58). Ultimately, the same officers were dispatched to her house where she continued with similar assertions and directives to the officers, including, among other things:

- Informing the officers that she purportedly fired the Chief of Police and replaced him with a new police chief;

- Telling the officers that if they did not like the new police chief she appointed then they would not last in their positions;

---

[1] The police officer Plaintiff initially contacted was in a car accident while driving to Plaintiff's home. The officer was injured and transported to the hospital.

- Informing the paramedics that she promoted an officer to captain; and

- Directing the officers to escort her to various parts of her home.

(*Id.* ¶ 57; Doc. No. 13-2 at 16). First responders convinced Plaintiff to go to the hospital after she had chest pain and nausea. (Doc. No. 13 ¶ 58).

At the hospital, Plaintiff resisted an officer's attempts to usher her into a private room and pulled off the officer's face mask. (*Id.* ¶ 59; Doc. No. 13-2 at 17-18). Although the officer believed Plaintiff's actions constituted ane assault, he did not arrest or charge her with assault because she was a councilmember. (Doc. No. 13-2 at 17). Plaintiff also continued to purportedly fire officers and assert that she fired the Captain because "he doesn't like black people." (*Id.* at 18; Doc. No. 13 ¶ 59). Eventually, the hospital sedated Plaintiff. (Doc. No. 13 ¶ 60). She was involuntarily committed, diagnosed with "acute psychosis," and released the next day. (*Id.*).

On the days following the September 9 incident, Plaintiff spoke to various media outlets about the incident, including asserting that the officers lied about the events of September 9, 2021, expressing her opinions about ethical issues with another mayoral candidate and other councilmembers, and criticizing the City Council's reaction to the September 9 incident. (*Id.* ¶ 66).

### 3. City Council's Response

On September 28, 2021, the City Council approved by 5-2 vote a Resolution of Censure. (*Id.* ¶ 68). The Censure concluded Plaintiff's conduct violated the Council's Code of Ethics. (*Id.*). Thereafter, on October 20, 2021, through counsel, five police officers involved in the September 9 incident sent a letter to the City requesting it open a formal investigation into Plaintiff's actions that night, and the press conferences thereafter. (*Id.* ¶ 69). The letter enclosed human resources complaints by four of the five officers. (*Id.* ¶ 70).

On November 9, 2021, the Council adopted by 4-2 vote a Resolution of City Council of City of Monroe, North Carolina, to Direct Issuance of a Petition in Amotion to Council Member Angelia Nikole James R-2021-89 (the "Amotion Resolution").[2] (*Id.* ¶ 72; Doc. No. 13-6). The Amotion Resolution observed that "an endeavor to remove a sitting Council member should never be undertaken except for the most serious circumstances." (Doc. No. 13-6). It directed the City Attorney to "prepare a petition in amotion to remove [Plaintiff] from office" and "incorporate[] information related to the September 9-10, 2021 incidents, as well as issues related to Covid-19 that the City became aware of on September 14, 2021, press conferences involving [Plaintiff] following the September 9-10, 2021 incidents, [and] claims raised by members of the City of Monroe Police Department on or before October 20, 2021." (*Id.*).

On December 13, 2021, the Council adopted rules for the amotion proceedings, which split the proceedings into two phases: (1) an evidentiary hearing before a Hearing Officer, and (2) a hearing before the Council as to whether to remove Plaintiff. (Doc. No. 13-7). Under the rules, during the evidentiary hearing, the Hearing Officer serves in "the role of a Judge, Administrative Law Judge or Arbitrator" and "subsequently present[s] a series of written findings of fact, conclusions of law, and recommendations to the City Council" as to "whether or not the Councilmember that is the subject of the petition should be removed from office." (*Id.* at 5, 9). Additionally, the City Council has "the burden to prove that the Councilmember who is the subject of the Petition has committed misconduct in office warranting removal from office, as alleged in the Petition and "[t]he burden shall never shift to the [Councilmember.]" (*Id.* at 6). On January

---

[2] Amotion is a common law procedure in North Carolina that permits the governing body of a municipality to remove one of its elected members. (Doc. No. 13-6).

6, 2022, the City filed the Petition in Amotion to Remove Plaintiff from City Council. (Doc. No. 1-4).

4.   Plaintiff's Allegations of Councilmembers' Bias

Prior to the evidentiary hearing, Plaintiff asserted that the City Council was biased against her and the amotion rules infringed on her due process rights because the rules precluded her from subpoenaing the councilmembers and Mayor to develop facts concerning such bias. (Doc. No. 13-2 at 6-8). Also before the evidentiary hearing Plaintiff argued certain councilmembers and the Mayor were biased because they voted to censure Plaintiff. (*Id.*). The Hearing Officer invited Plaintiff and the City to submit evidence and briefs with their positions, and although not entirely clear, it does not appear that they did. (*Id.*). Instead, after the hearing on January 27 and 28, the parties jointly proposed that the Hearing Officer recommend "to the City Council that [Plaintiff] and those who voted for the Censure . . . be excused from participating in any vote on [Plaintiff's] removal." (*Id.*). The Hearing Officer expressed concern with recommending excusing three democratically elected councilmembers and the Mayor without additional evidentiary support of bias, and requested the parties provide: (1) additional evidence of bias, if any; (2) a good-faith basis for seeking additional evidence of bias through a limited bias inquiry of the elected official who voted for the Censure; and (3) legal authority to support a substantive finding of bias based on the evidence presented or the evidence that could be established through a limited bias inquiry. (*Id.* at 6-7). The Hearing Officer also raised concerns about the City Council maintaining a quorum if she excused three councilmembers and the Mayor. (*Id.* at 7). The Hearing Officer scheduled a video conference for February 8, 2022, to allow the parties to address these requests and concerns, at which Plaintiff did not present evidence of bias to warrant recommending the excusal of three councilmembers and the Mayor. (*Id.*). The Hearing Officer concluded there was insufficient

evidence of bias presented to warrant "recommending that three democratically elected councilmembers and the Mayor be excused from voting on [Plaintiff's] removal." (*Id.*). "To preserve any impact on [Plaintiff's] due process rights, [the Hearing Officer] offered her the opportunity to question councilmembers and the Mayor in a limited inquiry to assess their alleged bias," but Plaintiff "declined to exercise this right." (*Id.*).

5. <u>Amotion Proceeding Phase I: Evidentiary Hearing</u>

The Phase I evidentiary hearing largely took place before a Hearing Officer on January 27 and January 28, 2022. (*Id.* ¶ 73). It closed on February 23, 2022, after the Hearing Officer considered Plaintiff's allegations of bias by certain voting councilmembers. (*Id.*). At the hearing on January 27 and 28, the Hearing Officer did not "limit the parties in terms of time or number of witnesses in presenting their cases." (Doc. No. 1-2 at 5). "Each party made an opening statement, presented their cases-in-chief, and made closing arguments." (*Id.*). The City presented evidence, including testimony of the officers involved in the September 9 incident and associated body cam footage. (Doc. No. 13-2 at 5; Doc. No. 15-1 at 5).

Plaintiff was represented by counsel, she testified, presented affidavits of three character witnesses, and Dr. Cotoman a board certified forensic psychiatrist testified that Plaintiff suffered from delirium characterized by the sudden onset of a cognitive break caused by hypoglycemia (due to only eating a smoothie that day) and exhaustion (from her mayoral campaign). (Doc. No. 13-2 at 5-6; Doc. No. 15-1 at 5). Plaintiff also presented, as evidence of unequal treatment, a report from an independent investigation by the law firm Parker, Poe, Adams and Bernstein, LLP in 2012-2013 (the "Parker Poe Report"), which concluded that the Council engaged in nepotism and influence over personnel decisions. (Doc. No. 13-2 at 24-25; Doc. No. 15-1 at 5-6; Doc. No. 13-23). The Parker Poe Report focused principally on the conduct of three white councilmembers,

none of which were reprimanded nor removed from office. (Doc. No. 13-2 at 24-25; Doc. No. 15-1 at 5-6; Doc. No. 13-23).

The Hearing Officer issued her Report on March 25, 2022. First, she made proposed findings of fact based on the evidence presented, in line with the facts as set forth above. (*Id.* at 8-25). Of note, as to Plaintiff's mental health, the Hearing Officer observed that Plaintiff presented little to no evidence from her treating physicians nor evidence that she received or planned to receive mental health treatment or to otherwise determine whether a similar incident may occur again or to mitigate that risk. (*Id.* at 19). As to Plaintiff's expert Dr. Cotoman's testimony, the Hearing Officer concluded Dr. Cotoman's process in reaching his conclusion was not sufficiently thorough and his testimony and memorandum contained at least four inconsistencies.[3] (*Id.* at 20-23). Therefore, the Hearing Officer placed little weight on the evidentiary value of his testimony and memorandum. (*Id.*). The Hearing Officer also observed that, according to the Chief of Police, Plaintiff's interactions with police on September 9, had a "'tremendous impact' on the police department, including by 'affecting the morale,'" and noted "Chief Gilliard experienced 'a range of emotions'" and "[s]everal other officers used the employee assistance program to seek

---

[3] The Hearing Officer concluded Dr. Cotoman's process was insufficiently thorough because he failed to speak to any of the treating physicians or other medical professionals regarding Plaintiff on September 9 and 10, 2021, failed to speak to or gather medical records from treatment Plaintiff received after the September 9, 2021 incident, and did not investigate Plaintiff's prior similar mental health incident ten to twelve years earlier. (Doc. No. 13-2 at 21-23). The Hearing Officer found the following inconsistencies: (1) Plaintiff's "delirium" was an isolated incident although he failed to investigate an alleged incident ten to twelve years earlier; (2) the conclusion that this event occurred from hypoglycemia because Plaintiff did not eat anything that day although the evidence suggested she ate a smoothie and his report indicated she did eat a smoothie, although at an incorrect time; (3) given the timing of when Plaintiff ate the smoothie, the hypoglycemia-triggered delirium did not appear to be an available explanation for Plaintiff's conduct earlier in the day; and (4) he testified exhaustion was potentially another trigger but did not offer exhaustion as a trigger in his memorandum. (*Id.*). Finally, she noted that Dr. Cotoman never met Plaintiff in person and only had a two hour Zoom meeting and one telephone call with her. (*Id.*).

counseling as a result." (*Id.* at 23). The officers that interacted with Plaintiff had "varying understanding of [Plaintiff's] authority and influence." (*Id.* at 24).

Next, the Hearing Officer's Report made proposed conclusions of law, including that (1) Plaintiff received notice and an opportunity to be heard and failed to show that the amotion proceeding would be determined by unbiased, impartial decisionmakers and rejected the proposal to excuse certain councilmembers from participating in the removal vote; and (2) the City proved that Plaintiff engaged in misconduct in office and just cause existed to remove her from office. (*Id.* at 25-40). The Hearing Officer concluded Plaintiff engaged in misconduct in office for which just cause existed to remove her for three reasons: (1) "even though she was not charged with a crime due to her status as a councilmember, the evidence indicates that [Plaintiff] committed a criminal assault and battery" against the officer at the hospital when she grabbed his face mask; (2) Plaintiff "violated the City Charter and the City Council's Code of Ethics when she purported to fire and promote police officers and tried to physically remove [a Captain's] police badge off his chest;" and (3) Plaintiff "engaged in misconduct when she made multiple false reports to the police that put individuals' safety at risk." (*Id.* at 32).

Finally, the Hearing Officer's Report stated that she did not believe the Hearing Officer had the authority to recommend how the City Council should vote. (*Id.* at 40-41). Rather, she recommended that "if the City Council agrees with my finding that just cause exists, I recommend that the councilmembers consider the factors and observations [discussed in the Report] . . . in casting their votes on removal." (*Id.* at 41). The Report listed several factors and observations for the City Council to consider. (*Id.* at 42-46).

6. Amotion Proceeding Phase II: Vote to Remove Plaintiff

The Phase II proceedings took place on April 7, 2022, at an open meeting of the City Council. (Doc. No. 13 ¶ 75). During the meeting, the Plaintiff was excused from voting, the Hearing Officer presented the Report with a slideshow and timeline, the councilmembers did not ask the Hearing Officer any questions, the City's attorneys gave closing statements during which they indicated they were objective representatives of the City, Plaintiff's counsel gave closing statements, the Council adopted the findings and conclusions of the Hearing Officer's Report, and the councilmembers voted to remove Plaintiff from office. (Doc. No. 13 ¶¶ 75-82). The City treated Plaintiff's removal as effective that day. (Doc. No. 13 ¶¶ 87-89).

6. <u>Removal Order</u>

On May 10, 2022, the City Council approved the Order of the City Council on Amotion Hearing, removing Plaintiff from City Council (the "Removal Order"). (Doc. No. 13-45). The Removal Order concludes Plaintiff "engaged in misconduct related to the duties of her office as a Member of City Council, and just cause exists for her removal from City Council due to her committing assault and battery on Officer Aycoth, violating the City Charter and Code of Ethics in purporting to fire, demote and promote Police Officers, and by making multiple false reports to the Police." (*Id.* at 23). As a result, Plaintiff was removed as a member of Monroe City Council "as of 6:40 p.m. on Thursday, April 7, 2022." (*Id.*).

**B. Procedural Background**

On April 23, 2022, Plaintiff filed this action. (Doc. No. 1). She requested a temporary restraining order and preliminary injunction enjoining the City from enforcing the April 7, 2022 vote removing her from City Council. After hearing, the Court denied the motion for temporary restraining order except, without objection, it enjoined the City Council from filling the vacancy

caused by Plaintiff's removal until the Court's ruling on Plaintiff's motion for preliminary injunction.

Thereafter, Plaintiff filed an Amended Complaint bringing the following claims: (1) § 1983 claim for retaliation for constitutionally protected speech; (2) § 1983 First Amendment claim asserting the City's Code of Ethics is overbroad; (3) § 1983 due process claim asserting the City's Code of Ethics is vague; (4) § 1983 equal protection claim for removing her from City Council because of her race; and (5) asks the Court to issue a writ of certiorari and review the City Council's removal decision and declare it illegal and void. After filing the Amended Complaint, Plaintiff also filed a Second Motion for Preliminary Injunction requesting Defendants "from taking any action to enforce the Council's April 7, 2022, vote and May 10, 2022, order removing James, including but not limited to any action that: (a) excludes James from participating in deliberations and votes concerning City business as a member of the Council; or (b) denies James the privileges appurtenant to the office of City Councilmember, until the conclusion of this action." (Doc. No. 15 at 2).

## II.    STANDARD OF REVIEW

Preliminary injunctions are extraordinary remedies "that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" *Paradies Shops, LLC v. Brookstone Charlotte, LLC*, No. 3:19-cv-00631, 2019 WL 6337818, at *1 (W.D.N.C. Nov. 26, 2019) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008)). "The standard for granting either a TRO or a preliminary injunction is the same and is well established." *Id.* The party seeking the TRO or preliminary injunction must demonstrate all of the following: (1) she is likely to succeed on the merits of her claim; (2) she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in her favor;

and (4) the injunction is in the public interest.  *Id.* at *2; *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).  *Pashby*, 709 F.3d at 320.  The decision is within the district court's discretion.  *Pashby*, 709 F.3d at 319.

## III.    DISCUSSION

### A.  Likelihood of Success on the Merits

"First, plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits."  *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013) (citations omitted). Plaintiffs need not show a "certainty of success" but must make a "clear showing" that they are likely to succeed at trial.  *Id.*

#### 1.    Section 1983 Claim: Retaliation for Protected Speech Claim

The First Amendment to the United States Constitution, in relevant part, provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment makes this prohibition applicable to the states. *Fisher v. King*, 232 F.3d 391, 396 (4th Cir. 2000). First Amendment protections extend to "the right to be free from retaliation by a public official for the exercise of that right." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).  A plaintiff bringing a section 1983 claim for First Amendment retaliation must show:  "(1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct." *Id.*; *Roncales v. Cnty. of Henrico*, 451 F. Supp. 3d 480, 495 (E.D. Va. 2020).

The First Amendment protects speech on matters of public concern.  *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964); *Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004). "Speech involves a matter of public concern when it involves an issue of social, political, or other

interest to a community." *Id.* "In analyzing whether speech involves a matter of public concern, [the Court should] consider 'the content, form, and context of [the] given statement[s], as revealed by the whole record.'" *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)). However, knowingly or recklessly false statements, even on matters of public concern, are not protected. *Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, Will, Cnty., Illinois*, 391 U.S. 563, 574-75 (1968); *New York Times Co. v. Sullivan*, 376 U.S. 254, 280-81 (1964).

Plaintiff argues that removing her from City Council and initiating the amotion proceedings were each separate instances of retaliation for exercising her First Amendment rights to criticize the police officers that responded to her on September 9 and the statements she made in press conferences thereafter.

### a. *Removing Plaintiff from City Council*

Plaintiff argues five categories of speech are protected by the First Amendment: (1) statements to the Chief of Police to retire; (2) statements about police officers' demeanors and/or biases; (3) post-September 9 statements to the press; (4) statements purportedly firing, demoting, and/or promoting police officers; and (5) her false claims about guests at the hotel. As an initial matter, for purposes of her removal claim, the first three categories of speech – statements to the Chief of Police to retire, statements about police officers' demeanors and/or biases, and post-September 9 statements to the press – were not found as misconduct in office by the Hearing Officer's Report or the Removal Order. Therefore, these categories are not relevant to Plaintiff's claim based on the City Council removing her from office. Instead, the Hearing Officer provided, the City Council adopted, and the Removal Order contains three instances of misconduct in office providing just cause for Plaintiff's removal: (1) she committed an assault and battery against a police officer; (2) she violated the City Charter and City Council's Code of Ethics when she

purportedly fired and promoted police officers and tried to physically remove a police officer's badge; and (3) she made false reports to the police that put individuals' safety at risk.

Next, Plaintiff argues the fourth category of speech – statements purportedly firing, demoting, and/or promoting police officers – are a matter of public concern which she characterizes as expressions of her opinion about the police officers. The Court disagrees that Plaintiff's statements were mere criticisms or opinions about police officers. Instead, Plaintiff made knowingly, or at the least recklessly, false statements to the police officers that she was promoting, demoting, and/or firing them, even though she did not have the authority to do such and which was in violation of the City Charter and City Council's Code of Ethics. As such the Court concludes Plaintiff failed to demonstrate that these false statements are protected. Similarly, as to the fifth category of speech – false claims about guests at the hotel being felons and murderers – Plaintiff has not demonstrated, that these false claims[4] about guests at the hotel being felons and murderers are constitutionally protected speech as opposed to recklessly[5] false statements. (Doc. No. 13-2 at 38-39).

Even if Plaintiff's knowingly and/or recklessly false statements are protected speech, Plaintiff has not demonstrated a causal relationship between the statements and the Defendants' conduct. A retaliatory motive alone does not establish a causal connection; rather, the motive must

---

[4] "Sergeant Craig and Lieutenant Brummer approached the man, obtained his identification card, and ran searches for any warrants against him. Ms. James accused other Black men in the hotel lobby of being felons and instructed the police to arrest them. No grounds existed for their arrest." (Doc. No. 13-2 at 37-38) (internal citations omitted).
[5] According to the Hearing Officer's Report, "Ms. James' conduct could have resulted in harm to those individuals she accused. Notably, the record indicates all the men Ms. James demanded to be arrested were Black. It is an unfortunate reality that encounters between police and Black men are more likely to result in injuries or death. Indeed, courts and studies across the country recognize that Black men are between 2 and 3 times more likely than white men to suffer violence by police. Ms. James therefore engaged in misconduct that jeopardized the safety of others." (Doc. No. 13-2 at 37-38) (internal citations omitted).

cause the injury.  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).  "Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Id.*  In other words, if the same alleged adverse action would have occurred regardless of the protected speech then there is not a sufficient causal link to state a claim for retaliation.  *Id.*  Here, even assuming Plaintiff's speech is protected, she also engaged in significant conduct that is not protected speech, including assaulting a police officer.  This was identified by the Hearing Officer and contained in the Removal Order as an instance of misconduct in office for which just cause existed to remove Plaintiff.

Plaintiff argues a causal relationship exists because she was removed for all three instances of misconduct in the aggregate, not independently.  She points to the Hearing Officer's Report which, one time, references the three instances of misconduct "cumulatively," and the Removal Order's use of the word "and" when listing the three instances of misconduct in office.  However, a closer look at the Hearing Officer's Report shows that the Hearing Officer analyzed and made independent conclusions as to each of the three instances of misconduct separately, and found each to be misconduct in office.  Further, Plaintiff has not demonstrated that the use of the word "and" in the Removal Order signifies the City Council removed her for the three instances of misconduct aggregately.  The Removal Order states that Plaintiff "engaged in misconduct related to the duties of her office as a Member of City Council, and just cause exists for her removal from City Council due to her committing assault and battery on Officer Aycoth, violating the City Charter and Code of Ethics in purporting to fire, demote and promote Police Officers, and by making multiple false reports to the Police."  The Court is not convinced that the "and" here signifies that the instances of misconduct only in the aggregate result in just cause to remove Plaintiff.  Instead, the Removal Order lists three instances of misconduct and the use of "and" signifies that each of the three

instances are separate instances of misconduct.  The sentence would not be correct with the use of the word "or" in the place of the "and."  Additionally, the Removal Order does not reference the three instances of misconduct "cumulatively."  Plaintiff has not made a clear showing that she would not have been removed but for her false statements as opposed to assault and battery on a police officer.[6]  *See King v. Cty. of New York*, No. 20-CV-8283 (PAC), 2022 WL 138009 (S.D.N.Y. 2022) (dismissing expelled councilmember's Complaint because there was no causal link between his anti-LGBTQ views and his removal; rather, councilmember's removal was caused by his numerous ethics violations).

### b.  Initiation of Removal Proceedings

Plaintiff also argues Defendants' initiation of removal proceedings is a separate injury caused by the Defendants' retaliation.  However, Plaintiff's claim based on the initiation of removal proceedings suffers from the same problems discussed above.  Specifically, the Amotion Resolution adopted on November 9, 2021, provided numerous reasons for the amotion proceedings, including "the September 9-10, 2021 incidents, as well as issues related to Covid-19 that the City became aware of on September 14, 2021, press conferences involving [Plaintiff] following the September 9-10, 2021 incidents, [and] claims raised by members of the City of Monroe Police Department on or before October 20, 2021."  (Doc. No. 13-6).  Additionally, the Petition in Amotion to Remove Plaintiff focuses on the September 9 incident, including assaulting

---

[6] To the extent Plaintiff argues *Mt. Healthy Cty. Sch. Distr. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), applies to shift the burden to the Defendant, as discussed above the Court concludes Plaintiff did not engage in protected activity.  If Plaintiff did engage in protected activity, at this stage, Plaintiff has the ultimate burden to make a clear showing of likelihood of success on the merits.  Even if the burden shifts to Defendants, for purposes of Plaintiff's motion for preliminary injunction, the record before the Court contains sufficient evidence for Plaintiff's removal regardless of the protected activity.

a police officer and purportedly making personnel decisions for the City. (Doc. No. 1-4). For the same reasons discussed above, Plaintiff has not made a clear showing that she engaged in protected speech. Even if she did engage in protected speech, she has not demonstrated the protected speech was the cause of initiating the amotion proceedings as opposed to her non-protected actions, such as assaulting a police officer.

For these reasons, Plaintiff has not demonstrated a likelihood of success on the merits on her § 1983 First Amendment Retaliation claim.

2. <u>Section 1983 Claims: First Amendment Overbreadth and Due Process Vagueness</u>

Next, Plaintiff argues portions of the City's Code of Ethics are unconstitutionally overbroad and vague. Under the doctrine of overbreadth, a statute violates the First Amendment if it prohibits a substantial amount of protected expression. *Legend Night Club v. Miller*, 637 F.3d 291, 295 (4th Cir. 2011). "[A] law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications." *Am. Entertainers, LLC v. City of Rocky Mnt., NC*, 888 F.3d 707, 715 (4th Cir. 2018). "This is because if an overbreadth challenge succeeds, any enforcement of the regulation at issue is totally forbidden." *Id.* "Invalidation for overbreadth is strong medicine that is not to be casually employed." *U.S. v. Williams*, 553 U.S. 285, 293 (2008) (internal quotation marks omitted). "The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Id.* Next, the court must determine whether the statute as construed prohibits a substantial amount of protected expressive activity. *Id.* at 297. "To prevail, an overbreadth plaintiff . . . must demonstrate that a regulation's overbreadth is not only . . . real, but substantial as well, judged in relation to the [challenged regulation's] plainly legitimate sweep, and also that no limiting construction or partial invalidation could remove the seeming threat or

deterrence to constitutionally protected expression." *Newsom ex rel Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 258 (4th Cir. 2003). If an ordinance regulates substantial amount of constitutionally protected speech, it must be narrowly tailored to serve an important governmental interest. *Hill*, 482 U.S. at 458.

The void for vagueness doctrine is rooted in the Due Process Clause of the Fifth and Fourteenth Amendments. *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019). A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32-33 (1963). "This test is not applied mechanically. The degree of vagueness tolerated in a law depends in part on the type of statute. Less clarity is required in purely civil statutes because the consequences of imprecision are qualitatively less severe." *Manning*, 930 F.3d at 272 (internal quotation marks omitted). Additionally, a stricter standard must be applied if criminal penalties may be imposed for violation of a law, a law fixes the permissible sentences for criminal sentences, and a law is quasi-criminal and has a stigmatizing effect. *Id.* at 272-73. "If a statute fails to provide any standard of conduct by which persons can determine whether they are violating the statute or does not provide minimal guidelines to govern law enforcement, the statute is unconstitutionally vague." *Id.* at 274 "But perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Williams*, 553 U.S. 285.

Plaintiff challenges the following provisions of the City's Code of Ethics as both vague and overbroad:

- Section 2. "Council Members should act with integrity and independence from improper influence as they exercise the duties of their offices," including:

- o "Behaving consistently and with respect toward everyone with whom they interact;"

- o "Exhibiting trustworthiness;"

- o "Living as if they are duly elected officials regardless of where they are or what they doing [sic];"

- o "Treating other Council Members and the public with respect and honoring the opinions of others even when Council Members disagree with those opinions;"

- o "Showing respect for their offices and not behaving in ways that reflect badly on those offices;" and

- • Section 4. Council Members should "act as the especially responsible citizens whom others can trust and respect" and "set a good example for others in the community."

 (Doc. No. 13 ¶¶ 179-180; Doc. No. 1-6 at 2-3).

Additionally, she challenges the following provisions of the City's Code of Ethics as only overbroad:

- • Section 2. "Council Members should act with integrity and independence from improper influence as they exercise the duties of their offices," including:

- o "Adhering firmly to a code of sound values;"

- o "Using their best independent judgment to pursue the common good as they see it, presenting their opinions to all in a reasonable, forthright, consistent manner;" and

- o Recognizing that they are part of a larger group and acting accordingly."

(*Id.*).

Defendants apparently do not dispute that the City's Code of Ethics is overbroad and vague. Instead, Defendants argue only one of three instances of misconduct relied on the Code of Ethics and Plaintiff has not demonstrated that she was removed for the three instances of misconduct in the aggregate. The Court agrees, Plaintiff has not demonstrated the alleged unconstitutional

provisions caused her removal. Even if the provisions of the Code of Ethics that Plaintiff challenges are unconstitutionally overbroad or vague, the Removal Order lists other instances of misconduct not related to the Code of Ethics, such as the assault on a police officer. Additionally, even where the City Council concluded Plaintiff "violat[ed] the City Charter and Code of Ethics in purporting to fire, demote and promote Police Officers," Plaintiff does not challenge each provision of the Code of Ethics relied on by the City, and does not challenge the City Charter such that striking the unconstitutional provisions would lead to the same result. Further, regardless of whether the Removal Order mentions the Code of Ethics, the actual misconduct in office itself remains the same.[7]

Finally, Plaintiff argues the Removal Order was "infected" by an unconstitutionally overbroad and vague Code of Ethics such that even if other grounds existed for her removal remanding the case back to the City Council is appropriate. *Berger v. New Hanover Cnty. Bd. of Comm'rs*, No. 13 CVS 1942, 2013 WL 4792508, at *8 (N.C. Sup. Ct. Sept. 5, 2013). In *Berger*, on certiorari review, the business court remanded the amontion proceeding because of due process concerns where the removal order contained findings of fact based on information not in the record. The court concluded that even if the removal decision was otherwise supported by sufficient facts, the due process concerns were not cured and remand was required. However, the due process concerns in *Berger*, in which facts not in the record were relied upon to remove an elected official,

---

[7] At the hearing, Plaintiff argued the Supreme Court's decision in *Mt. Healthy Cty. Sch. Distr. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), requires the Court to only consider what actually motivated the decision to remove Plaintiff, not whether a lawful basis to remove Plaintiff existed. However, even assuming this standard applies, Plaintiff has not sufficiently demonstrated that the alleged overbroad or vague provisions of the Code of Ethics were motivating factors in removing Plaintiff. Rather, the record demonstrates that the actual misconduct itself, not any provisions of the Code of Ethics, was the motivating factor in removing Plaintiff.

are entirely different than the facts here. Here, Plaintiff had the opportunity to be heard and does not challenge that the Hearing Officer relied on facts not in the record, and Plaintiff was aware when amotion proceedings were initiated that the City Council was relying on the Code of Ethics. Most noteworthy, the Hearing Officer's Report and Removal Order provide three grounds removing Plaintiff, and not all three grounds are "infected" by an allegedly unconstitutional Code of Ethics. For example, even if the conclusion that Plaintiff's removal for violating the Code of Ethics is "infected" by an unconstitutional Code of Ethics, Plaintiff also engaged in misconduct in office by assaulting a police officer for which just cause existed to remove Plaintiff. This instance of misconduct is not "infected" by an allegedly unconstitutional Code of Ethics.

Accordingly, Plaintiff has not demonstrated that she has a likelihood of success on her overbreadth and vagueness claims.

3. Section 1983 Claim: Equal Protection

Plaintiff also asserts a race-based equal protection claim. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *Lowe v. Cty. of Charleston*, No. 2:20-cv-04423-DCN, 2022 WL 1063978, at *2 (D.S.C. Apr. 8, 2022) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To succeed on an equal protection claim, a plaintiff must show (1) that she has been treated differently from others with whom she is similarly situated, and (2) the unequal treatment was the result of intentional or purposeful discrimination. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). "[P]ersons who are in all relevant respects alike are 'similarly situated.'" *Scarborough v. Frederick Cnty. Sch. Bd.*, 517 F. Supp. 3d 569, 580 (W.D. Va. 2021). "Although different courts describe this requirement in different ways, however the test is written, the basic

point is the same: the evidence must show an extremely high degree of similarity." *Just Puppies,
Inc. v. Frosh*, No. ELH-21-1281, 2021 WL 4594630, at *44 (D. Md. Oct. 6, 2021). "Once this
showing is made, the court proceeds to determine whether the disparity in treatment can be justified
under the requisite level of scrutiny." *Id.* Race-based action is subject to strict scrutiny, meaning
it is constitutional only if it is narrowly tailored and necessary to further a compelling
governmental interest. *Grutter v. Bolinger*, 539 U.S. 306, 308 (2003).

Plaintiff asserts she was treated differently from other white councilmembers with whom
she is similarly situated. She points to the Parker Poe Report completed in 2012 to 2013, which
found that white councilmembers engaged in nepotism, intimidation, and influencing of personnel
decisions, but for which no disciplinary action was taken in response. However, Plaintiff has not
demonstrated that she is similarly situated to the councilmembers referenced in the Parker Poe
Report. The Parker Poe investigation addressed improper use of positions of authority by certain
councilmembers over a period of time. This is not in all respects like events that occurred over
one night on September 9-10, 2021. During the September 9 incident, Plaintiff physically
assaulted a police officer and made false reports about felons and murderers at a public place
creating a dangerous situation to the public. Additionally, the incidents on September 9 do not
raise questions as to whether Plaintiff engaged in nepotism or influenced personnel decisions;
rather, Plaintiff outwardly misused her authority to purportedly fire, demote, and/or promote police
officers responding to an ongoing disturbance that Plaintiff created. If the Court accepted
Plaintiff's position and concluded the Plaintiff was similarly situated to the councilmembers
referenced in the Parker Poe Report, it would effectively prevent the City Council from ever
reprimanding or disciplining any member of City Council for any reason because it did not do so

in response to the Parker Poe Report. Accordingly, Plaintiff has not demonstrated she is similarly situated to the councilmembers at issue in the Parker Poe Report.

Furthermore, Plaintiff must show that the unequal treatment "was motivated, at least in part, by an 'invidiously discriminatory' intent." *Sylvia Development Corp. v. Calvert Cnty, Md.*, 48 F.3d 810, 819 (4th Cir. 1995). Plaintiff has not demonstrated that Defendants were motived by a discriminatory intent based on Plaintiff's race as opposed to the misconduct in office that occurred during the September 9 incident. Accordingly, Plaintiff has not demonstrated that her equal protection claim is likely to succeed on the merits.

### 4. Certiorari Review and Declaratory Judgment

Finally, Plaintiff asks the Court to review the quasi-judicial decision to remove Plaintiff. She argues (1) her conduct on September 9 was not "misconduct in office;" and (2) the Council did not comply with its own amotion proceeding rules.

In North Carolina, quasi-judicial findings are reviewable by *certiorari*. *Berger v. New Hanover Cnty. Bd. of Comm'rs*, No. 13 CVS 1942, 2013 WL 4792508, at *8 (N.C. Sup. Ct. Sept. 5, 2013).

> Upon *certiorari*, the court sits as an appellate court rather than an original trial court charged with the duty of making its own findings of fact. As to matters of law, the court proceeds *de novo*, meaning that it is not required to give deference to the governing body's determination as to such issues. In contrast, as to matters of fact, the court's inquiry is limited to determining whether there was sufficient competent evidence to support the finding, and if there was, the finding is conclusive, even if there was competent evidence to support a contrary finding. In determining whether there is such evidence, the court examines the entire record below, and the process is referred to as a whole record test.

*Id.* (internal citations omitted). "[A] court called upon to make that final review will necessarily be faced with achieving the balance between the extraordinary concept of overturning the results of an election and a set of facts which can also be extraordinary in its presentation of how an

elected official has acted or failed to act so as to hamper the functioning of the office to which he or she was elected or create safety, security, or liability concerns arising from his or her action or inaction in office." *Id.* at *16. Whether "just cause" exists to remove a person from office "should not flex solely on the whims of political winds" and will "depend upon conduct that is sufficiently tied to the duties of the elected office from which an elected official is being removed." *Id.* Courts should distinguish between "misconduct in office" and other evidence, which although is unsavory, does not impact official duties to a sufficient manner to warrant removal. *Id.*

### a. Misconduct in Office

First, the Hearing Officer's Report and the Removal Order concluded that Plaintiff engaged in misconduct "in office," but Plaintiff argues that her conduct was not "in office." Here, there is sufficient evidence to support the Hearing Officer's finding that Plaintiff's misconduct occurred "in office." Throughout Plaintiff's interaction with the officers she used her position as a councilmember and misused her authority to purportedly fire, demote, and/or promote officers. She called the Chief of Police personally multiple times about her interactions with officers and to inform him of her purported personnel decisions, something she was able to do because of her position as a councilmember. Additionally, the officers knew Plaintiff was a councilmember and addressed their response to Plaintiff based on her position as a councilmember. For example, Plaintiff was not charged after assaulting a police officer because the police officer knew she was a councilmember. For these and the reasons set forth in the Hearing Officer's Report, there is sufficient evidence to support the finding that Plaintiff's misconduct was "in office."

Next, Plaintiff argues she did not engage in "misconduct" because she was suffering from mental illness such that her conduct was not intentional. Plaintiff only cites to Black's Law Dictionary's definition for "official misconduct" for her position. However, the Hearing Officer

considered evidence of Plaintiff's mental illness, but gave it little weight based on insufficient thoroughness and inconsistencies.  Based on the reasoning in the Hearing Officer's Report, sufficient evidence exists to support the conclusion that Plaintiff engaged in misconduct.

Accordingly, Plaintiff has not demonstrated she is likely to succeed on the merits that she did not engage in misconduct in office.

### b. Amotion Proceeding Rules

Finally, Plaintiff argues the Council failed to comply with its own amotion rules in four ways: (1) the Hearing Officer's report did not contain a recommendation as to whether Plaintiff should be removed from office; (2) the City's outside counsel told the Council that they acted as objective investigators during Phase II of the amotion proceedings; (3) the City Council impermissibly shifted the burden of proof to Plaintiff; and (4) three of the voting councilmembers censured Plaintiff and had "pre-fixed" opinions as to Plaintiff's conduct.

First, the amotion proceeding rules state that a hearing officer will issue a written recommendation which should include "proposed findings of fact, conclusions of law, and the recommendation of the Hearing Officer on whether or not the Councilmember that is the subject of the Petition should be removed from office."  (Doc. No. 1-8 at 9).  Here, the Hearing Officer's Report included proposed findings of fact, conclusions of law, and a recommendation in which the Hearing Officer concluded that she did not have the authority to recommend how the City Council should vote.  It included a recommendation that "if the City Council agrees with my finding that just cause exists, I recommend that the councilmembers consider the factors and observations [discussed in the Report] . . . in casting their votes on removal."  (Doc. No. 1-2 at 41).  The Court finds in light of the Hearing Officer's conclusion that she did not have authority to recommend how the City Council should vote she made a sufficient recommendation to comply with the

amotion rules. Further, Plaintiff does not demonstrate why the Hearing Officer's ultimate conclusion and recommendation is sufficient to vacate the City Council's decision, particularly where she received due process throughout the proceedings.

Next, Plaintiff argues the City's outside counsel mislead the councilmembers because they told the City Council at the Phase II hearing that they acted as objective investigators, contrary to the amotion proceeding rules. The Court does not find that such a statement, in the context of the months long amotion proceedings, misled the councilmembers or that they otherwise were not aware of the amotion proceeding rules. In any event, Plaintiff again fails to demonstrate or provide any reason as to why this would be sufficient to vacate the decision.

Third, Plaintiff argues the City Council impermissibly shifted the burden of proof to Plaintiff. However, the record shows that the City had the burden on presenting evidence that Plaintiff engaged in misconduct in office, and did present evidence to support such finding. Plaintiff argues that the burden shifted to her because the Hearing Officer's Report noted that Plaintiff failed to present sufficient evidence of her mental illness. Plaintiff used her mental illness as a defense as to why she did not engage in misconduct in office. Plaintiff's apparent position that the City had the burden to disprove Plaintiff's defenses, particularly related to her mental health, is unavailing.

Finally, Plaintiff argues the City Council improperly permitted three of the councilmembers to vote on removing her since they censured Plaintiff and had "pre-fixed" opinions as to Plaintiff's conduct. Plaintiff had ample opportunity to make this argument before the Hearing Officer, which she did. Indeed, the Hearing Officer gave Plaintiff the opportunity to present evidence of bias to warrant recommending the excusal of the three councilmembers and a good-faith basis for seeking additional evidence through a limited bias inquiry of those

councilmembers. Plaintiff declined to do either, after which the Hearing Officer concluded there was insufficient evidence of bias presented to "warrant recommending that three democratically elected councilmembers and the Mayor be excused from voting on [Plaintiff's] removal." (Doc. No. 13-2 at 7). Plaintiff has not demonstrated why, in light of the due process she received, the decision should be vacated on this ground.

Accordingly, Plaintiff has not demonstrated that she is likely to succeed on the merits on certiorari review.

### B. Irreparable Harm, Balance of the Equities, and Public Interest

Plaintiff must also demonstrate that she is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in her favor, and that a preliminary injunction is in the public interest.. *Pashby*, 709 F.3d at 328. Generally, these "factors [are] established when there is a likely First Amendment violation." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013). Here, because the Court concludes Plaintiff has not demonstrated a likelihood of success on the merits of her claims Plaintiff is not entitled to a preliminary injunction and the Court need not analyze these remaining factors. *Pashby*, 709 F.3d at 320-21. In any event, Plaintiff argues these factors weigh in her favor because removing Plaintiff from the City Council was unconstitutional. Since Plaintiff relies almost entirely on her constitutional claims but did not demonstrate a likelihood of success on such claims Plaintiff fails to demonstrate the balance of the equities tip in her favor or that a preliminary injunction is in the public interest.

### IV.  CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1.  Plaintiff's Motion for Preliminary Injunction (Doc. No. 3) is **DENIED as moot**; and

2.  Plaintiff's Second Motion for Preliminary Injunction (Doc. No. 15) is **DENIED**.

Signed: August 10, 2022

Robert J. Conrad, Jr.
United States District Judge